NO. 07-05-0185-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



MARCH 23, 2006


 

______________________________




JIMMY GAWAN YOUNG, 


 

 Appellant


v.



THE STATE OF TEXAS, 



 Appellee



_________________________________



FROM THE 223RD DISTRICT COURT OF GRAY COUNTY;



NO. 6577; HON. LEE WATERS, PRESIDING



_______________________________


 

Memorandum Opinion


_______________________________



Before QUINN, C.J., and REAVIS and CAMPBELL, JJ.

 Jimmy Gawan Young (appellant) appeals his conviction for involuntary
manslaughter. Via three issues, appellant contends the 1) evidence was insufficient to
support his conviction and 2) trial court erred by admitting evidence of gang activity which
was irrelevant to the offense. We affirm.

Background


 At trial, Pampa police officer Keith Morris (Morris) testified that on April 3, 2003, he
responded to a call to investigate shots being fired with one person down at 1040 Huff
Road in Pampa, Gray County, Texas (known as "the Hood") around 6:00 p.m. When he
and Officer Williams arrived, Morris observed "people everywhere running around" and
"there was panicking going on." Morris, upon exiting his vehicle and walking towards
people waving him over, observed Tracy Williams (Tracy) "between two cars in front of the
house there, and she had what appeared to be a gunshot wound to the chest." CPR was
started and continued until the ambulance arrived. Tracy later died from her injuries.

 Morris spoke with Reggie Williams (Reggie), Angela Burnley (Angela) and Michael
Williams (Michael) at the scene. After receiving information from the witnesses, Morris
asked that the crime scene tape be moved back to not only encompass the yard but the
street in front of the house. He also testified that Michael was wearing red clothing which
indicated he was affiliated with the Bloods gang. He also noticed spent shell casings
around the front porch area. Later, one of the cars was found with bullet holes in the back
passenger window. 

 Furthermore, according to Morris, a Nathan Williams (Nathan) was present and
began yelling at an older man at a neighboring house. Nathan was wearing blue, the color
identified with the Crips. According to Morris, the Bloods and the Crips are rival gangs. 
Nathan shouted out to the man "that he was a gangster and that this man that was upset
with him needed to respect his gangster status." The residence located at 1040 Huff or
Miss Hattie's house is the dividing line for the two gangs. Later, some shotgun shells were
found at the south side of Miss Hattie's house. Furthermore, a .357 revolver was found
underneath a mattress just behind the house. 

 On cross-examination, Morris admitted that while he was working to save Tracy,
several people walked through the crime scene, one of the cars was moved twice which
also would have disturbed the crime scene. Furthermore, he had received conflicting
stories as to who was the shooter and it came down to two persons, Curtis Wine (Wine)
and "somebody named Slim," who was later identified as appellant. The officer noted that
approximately 20 to 30 rounds were fired. He also had found out about an incident
between appellant and Wine that had occurred the night before. Wine was angry because
someone had stolen money from him and "he was going to get revenge." Also, the officer
had learned that there were, allegedly, up to four shooters during the incident. 

 Next, Joey Williams (Officer Williams) with the Pampa Police Department testified
that he was in the car with Morris when they received the dispatch to 1040 Huff. Once
there, he observed a large group of people in the front yard and a female lying in between
two cars. He further recognized Nathan, who was having a heated argument with an older
black male. He heard the older black male shout that "this stuff had to stop." Nathan
replied that the man "had better respect his . . . gangster status." Furthermore, the officer
testified that Nathan was claiming to be a member of the "Crips," and later on Nathan
claimed he didn't care what had happened "because he already made his money." Nathan
was dressed in blue which was significant since the Crips dress in blue. Officer Williams
testified that he helped in the search for weapons and that he found a .357 pistol
underneath a mattress behind a vacant house located at 1052 Huff Road along with some
"unfired .357 cartridges." The pistol was introduced into evidence as State's exhibit 12. 

 Officer Heather Ratzlaff (Ratzlaff) with the Pampa police department arrived to find
approximately a hundred people, several were running and walking very fast. She testified
that she knew some of them, one was Ongel Kwame Burnley (Kwame), who was dressed
in red and associated with the Bloods. She also recognized Candy Burnley (also known
as Angela), Reggie and Michael. She looked for guns because the call was on "'shots
fired' and one person was down." Ratzlaff, further, testified that she observed a bullet hole
through the window of a "little black vehicle." She also testified that "[w]e have several
different gangs in the town and one being the Crips which are dressed in blue and the
other being the Bloods which dress in red." She began assisting in chest compressions
on the victim. According to Ratzlaff, one of the two vehicles surrounding the victim was
moved in order to make room for the paramedics. She then began taking witnesses'
statements and a witness, Herbert Wilbon, told her that he, after hearing gunshots, saw
Wine running from the crime scene with a gun in his hand. She further spoke with two
juvenile girls who told her "about seeing the two men shooters." The girls were taken to
the police station to give statements since they were juveniles. She also was advised of
another gun being found on Prairie Street, which was identified as a Tech 9. 

 Next, Santos Mathis, testified that he was in the front yard across from Miss Hattie's
house. He heard two guys arguing and saw one guy waving a gun, he ran into the house
and while in the house he heard gunshots that sounded like a revolver. He further testified
that the gun he saw looked like State's exhibit 12. 

 Angela testified that she was living at 1040 Huff on the day of the shooting. She
was the victim's aunt. She testified that Tracy had just driven up in a little black car after
going to the store and was getting out of the car when Angela came out onto the porch in
front of the house. Tracy was standing by the driver's side towards the front of the car. 
Angela then heard gunshots and ran to take cover. She was with her son, Kwame. After
the gunshots stopped, she went back out on the porch and saw Tracy lying between two
cars, a white one and a black one. Furthermore, the only person she saw firing a weapon
was "Curtis" and that it was a "9mm." 

 Next, Aaron Keith McWilliams, who was with Pampa Police Department at the time
of the shooting testified that he, too, overheard an argument between Nathan and another
black male wherein Nathan stated that he didn't care what had happened, he had "made
[his] money for the day." Nathan was also wearing blue, according to McWilliams. 
Furthermore, he stated that "the people who will wear the red colors tend to stay to the
north of 1040 Huff and the people that wear the blue colors tend to stay to the south of
1040 Huff." Both colors could be seen at 1040 Huff because family members of the
residents affiliated with both groups. 

 Mayra Heredia, one of the juveniles taken to the police department to give a
statement, testified that she was in the house across from 1040 Huff and heard shooting. 
She looked out the window and saw "[a] black man in a red shirt with a gun." She looked
to where the man was pointing with the gun and she saw another man behind a bush
wearing a blue shirt. She saw the man in red standing and shooting, then, he stopped,
reloaded and began walking towards the house at 1040 Huff and began shooting again. 
She further testified that someone was shooting from the area where the man behind the
bush was located but could not tell in what direction. She further recalled the two vehicles
parked in the driveway, a black one parked next to a white one. 

 Morse Burroughs, who was employed by the Gray County Sheriff's office,
photographed the crime scene. In testifying to State's exhibit 20, the picture of the bullet
hole in the black Nissan, Burroughs explained that "[t]his is a photograph of the driver's
side of the [black Nissan] that was parked in the yard indicating a bullet hole or what
appears to be a bullet hole in the window." State's exhibit 21 was a picture of "the opposite
side of that same vehicle showing what appears to be two exit holes from the same
projectile." State's exhibit 24, according to Burroughs, is a photograph of the "interior of
this same black vehicle. The cone [evidence markers] is covering a fragment of what
appeared to be a bullet." 

 The State called Paul Brown, who was also present at 1040 Huff on the day of the
shooting. He testified that he knows appellant as "Slim" and that appellant was also at
1040 Huff on April 3rd. Furthermore, Brown testified that he had been charged with
manslaughter in connection with this case. After admonishing him, Brown invoked his fifth
amendment right to remain silent for the remainder of examination. 

 Donnie Brown, a detective with the Pampa Police Department, testified that he took
possession of the revolver found under the mattress, which gun was State's exhibit 12. It
was found with one spent cartridge and five live rounds. In regards to the black Nissan,
the detective noticed "the one bullet hole in the left rear window," and he further "noticed
that there was [sic] two holes on the other side." The side with two holes was "the
passenger's side of the vehicle." This information was depicted in State's exhibits 20, 21
and 23. Brown further testified from the autopsy report that indicated Tracy had received
a gunshot wound to the chest; however, there was "no gunpowder residue on the surface
of the skin." Furthermore, the report indicated that "'a medium caliber deformed
(mushroomed) bullet [was] recovered in the right back in an area just beneath the skin
surface.'" This gunshot wound caused Tracy's death. 

 Detective Brown also testified that a later search was conducted at 1040 Huff where
a casing was found near the area where Tracy had been shot. The casing came from the
revolver, State's exhibit 12. A print was also lifted from the revolver which matched
appellant's. The officer assisted in investigating and questioning witnesses which led him
to obtain a warrant for appellant's arrest. On cross-examination, the detective admitted
that six people including appellant were arrested in connection with the death of Tracy. 
Furthermore, the bullet fragment could not "be directly related to the .357 revolver." And,
the officer observed no evidence, during the autopsy, that a bullet jacket had struck the
victim's body. The officer further testified that the jacket or casing located at 1040 Huff
was found approximately 19 days after the shooting incident. And, during the 19 days, the
crime scene was unprotected and people were free to walk through the area. Brown also
testified that the purpose for him going to Huff on the 22nd was to see if he could find the
jacket. This was so because once the DPS report on the bullet was received wherein it
stated the bullet was missing its jacket or casing, then Brown understood why there were
two holes on the other side of the car window. 

 Gary Henderson (Henderson), who was employed by the Texas Department of
Public Safety, Texas Ranger Division, at the time of the offense, testified that he was called
into the investigation by Detective Dupy of the Pampa Police Department. The reason for
his involvement was because Detective Dupy "had possession of a vehicle that was seized
at the scene and he said that he had a situation that he didn't quite understand." That
situation involved his inability "to figure [] out as far as he had one bullet hole going in the
back left side window of that vehicle and two holes exiting the right rear window of that
vehicle, and he said he could not find a second bullet anywhere and he couldn't find where
the second bullet entered the vehicle, and so he requested my assistance in evaluating
and looking at the vehicle." On April 11, 2003, Henderson arranged for a test fire of a
firearm into the window of a car which was the same as the black Nissan. The gun used
for the test was a 9 mm. The test was "to determine. . . the positioning of [the] vehicle at
that location." And, its results revealed "that the bullet came from left to right on the vehicle
that was parked at 1040 Huff Road." And, again, the trooper testified that "based on what
we've been able to determine, [the bullet] would have been on the left side of that vehicle
traveling through to the right side where your two holes are located on the right-hand side
of that vehicle going toward the white vehicle parked next to it." Furthermore, "a small
piece of copper, what appeared to . . . be jacketing commonly used in jacketed bullets" was
found inside the vehicle while at the wrecker yard. According to Henderson, "[i]t appeared
to me that a single bullet entered that hole, either the bullet itself being a lead-tipped bullet,
if that's what it was at the time, and would have had to have broken in-half, therefore
exiting side by side. Or if it was a jacketed bullet, it would have to have separated from the
jacketing, the lead portion of the bullet going through one and the jacketing going through
the other."

 Henderson believed that the jacket might have been "located in the victim's clothing
or in the area of where the two vehicles were at the time of the shooting." Upon searching
the area outside of 1040 Huff on April 22nd, Henderson observed the white car to still be
in the position it was in on April 3rd and a Geo Prism was parked next to it. He looked
between the two cars and "immediately observed what [he] knew to be a copper jacketing
on the ground." The trooper concluded in his report that 

 "'based on what writer observed in the test firing, evidence would indicate the
vehicle that had the bullet holes in the rear passenger windows located at the
scene of the shooting had been pulled straight into the driveway at 1040 Huff
Road, not backed in. This evidence is based on the belief the bullet that
killed Tracy Williams is the same bullet that traveled through the rear
passenger windows of the vehicle.'" 


Henderson's report further represented that "the test firing evidence would further indicate
to writer that only one bullet entered the vehicle from the left side even though there were
two exit holes on the right rear passenger window. Evidence indicated the bullet may have
fragmented or dislodged from its jacket, thus causing the similar and close proximal exit
holes."

 Connie Lockridge testified to finding 9 mm casings in the yard at 1052 Huff, south
of the vehicle. Aaron Fullerton, a forensics firearm examiner with the Texas Department
of Public Safety Crime Laboratory in Lubbock, Texas, testified that he received both guns
that were found in connection with the April 3rd incident and conducted tests on them. In
regard to the Tech 9, five of the ten 9mm casings submitted by the police were fired from
the gun; however, five were not. In regard to the .357 revolver, all five .357 caliber casings
submitted for testing were fired from that gun, including State's exhibit 59, the brass jacket. 
Furthermore, regarding the bullet removed from Tracy, Fullerton testified as follows: "This
[the bullet] was consistent with not actually being a bullet but a bullet core which is the
interior part of a bullet that the jacket surrounds, and the jacket is what's going to actually
pick up the markings left behind by the gun. There would be no markings left behind by
the gun on the interior portion of the bullet core. So I was not able to identify or eliminate
this as being fired by either of those firearms." Further, in his report to the police
department, Fullerton represented that "'[t]he bullet core cannot be identified or eliminated
as having been fired from either of the submitted firearms.'" Also, the 9mm and .357 bullets
are "virtually identical bullets in the weights and the diameter." Claude Stephens with the
Randall County Sheriff's office identified a fingerprint lifted from the .357 revolver as that
of appellant's. 

 Kwame testified that he knew appellant and Wine. He was present at 1040 Huff on
the day of the shooting. He was the victim's cousin, Miss Hattie was his grandmother,
Michelle Burnley was his sister, and Angela was his mother. He testified that he normally
hung out at 1040 Huff (Miss Hattie's house). He was more associated with Bloods and
would wear red but he associated with both groups. Wine told Kwame of the robbery,
however, he did not indicate that he "was out for blood, revenge." In the afternoon of April
3rd, Kwame was standing outside at 1040 Huff with Wine, Michael and Jelani McNeal
(McNeal, also known as J Rock). Tracy was pulling up in a car at the time. Kwame walked
south to 1052 Huff and saw Paul Brown along with a lot of people, who were standing
around. After Tracy pulled up, she began walking toward the porch between the two cars
(a white Lincoln and a black Nissan). Kwame was in the yard with Wine, and McNeal was
near the black Nissan. He heard gunfire and saw that appellant had started shooting. 
Appellant was in the street. He also observed Wine with a Tech 9. Appellant was using
"some kind of revolver." He did not observe anyone else with a gun. The people in the
yard ducked behind the cars. Kwame testified that the gunfight was about a robbery. 
While he was walking back to Miss Hattie's house from 1052 Huff, prior to the shooting,
appellant was walking beside him in the same direction and that is when Kwame observed
appellant with a gun. Then, Wine obtained a gun. According to Kwame, no one in the
Hood had gotten into a gunfight until appellant showed up approximately two weeks prior
to the incident. All of the participants had gotten along and if there were any problems they
fought with their fists and not with guns. Kwame admitted that drugs were sold in the
Hood.

 Evelyn Turrentine (also known as Evelyn Turrentine Rogers) testified that she and
Wine were "seeing each other" when the shooting occurred. On April 2, 2003, an incident
occurred between Wine and appellant. She drove Wine over to a house where appellant
was located, Wine went inside and about two minutes later he came out and told her to
drive away. He advised Evelyn that appellant had just robbed him by gunpoint. She
dropped Wine off at his house and then about four or five hours later he showed up at her
house upset. She testified that he "was very upset that [appellant] had, you know, just kind
of rolled into town and, you know, had just picked him to mess with." She further stated
that Wine "didn't know what to do," or "what he was going to do." Later that evening, while
she and Wine were watching T.V., appellant came to her house and while holding a gun
attempted to kick in her door. She saw Wine the next day around ten in the morning and,
while driving Wine' car, they went onto Huff Road. Wine got out, and she left to get
something to eat. She further testified that when she left Wine, she observed him retrieve
a gun from underneath the seat. As she was driving, Evelyn saw appellant standing in the
driveway of the house where Wine had been robbed. She also saw a pickup occupied by
Paul Brown and Nathan drive by. By the time she returned, the police had the area
blocked off. She later saw Wine at his house and he told her he needed to get out of town. 
They, then, left for Amarillo and stayed there for about a day and a half before returning
to Pampa. Later, Wine was arrested and Evelyn went to the police station to give a
statement. Her statement consisted primarily of representations made to her by Wine as
opposed to her personal knowledge. Evelyn also stated without objection, that appellant
was a Crip and Wine was a Blood. So too did she testify that from the location where she
saw appellant standing and where she dropped Wine off, it would have to have been
appellant who shot Tracy. 

 McNeal testified that 1) on April 3, 2003, he lived on Huff Road with his girlfriend,
Michelle, 2) some persons wore red for Bloods and some wore blue for Crips but no one
was really affiliated with either gang, 3) drugs were sold in the Hood, 4) on the day of the
shooting, he was standing in the driveway of Miss Hattie's along with Kwame, Wine and
Michael, 5) appellant and Nathan were in the yard of 1052 Huff along with several girls, 6)
when the shooting began, he (McNeal) was next to the small blue car that was parked
behind the black Nissan, 7) he first saw appellant in the street with a gun, 8) of the group
with McNeal, only Wine had a gun, 9) Wine was in the field next door to Miss Hattie's
house and 10) Wine pulled his gun out and started shooting back as he walked from the
field to the front yard of Miss Hattie's. 

 Michele testified that 1) she was up the street at 1016 Huff when the shooting
started, 2) she saw appellant walking in the street with a gun, 3) once the shooting started,
she grabbed her daughter and carried her into the house, 4) she then came back out and
saw Wine shooting on the other side of Miss Hattie's house, 5) she saw no one else with
a gun, 6) she saw appellant running south and 7) when Wine was shooting, he was doing
so in front of the cars parked in the driveway of Miss Hattie's house, not behind them.

 Reggie testified that he had lived in the Hood most of his life, and on the day of the
shooting he resided at 1040 Huff. On that same day, he was standing in the yard and saw
appellant walking towards Wine and yelling at him and calling him names that were
derogatory to the Bloods gang. He also saw appellant with a gun in his hand and he saw
Wine yelling back and waving his hands without a gun. Wine "wasn't too far from the . . .
car." Tracy was on the other side of the car getting groceries out. Reggie only heard two
shots and ran into the house. He then heard someone yell that Tracy had been shot and
saw Wine in the yard shooting. On cross-examination, Reggie stated that even though he
wore red he was not a member of a gang. Furthermore, just because some people wore
colors of particular gangs did not make them gang members.

 Steve Powers with the Amarillo Police Department testified as an expert on gangs. 
Based on the information he received about the incident and appellant's tattoos and
placement of those tattoos he, in his opinion, believed appellant to be a member of the
Crips gang.

 Wine then testified that he had not known appellant for more than two and half
months prior to the shooting. He sold drugs to both gangs, the Bloods and the Crips and
had that reputation in the Hood. According to Wine, Brandon Young brought appellant to
Pampa. On the night before the shooting, appellant robbed Wine by gunpoint of his drugs
and money. The gun used was a revolver, the same one marked as State's exhibit 12. 
After that incident, Wine contacted a person about buying a gun, and ultimately purchased
a "Tech." On the day of the shooting, Wine had gone to 1040 Huff and hid the gun behind
some bushes. He also saw appellant with others including Nathan at 1052 Huff, Wine
spoke to a person named Bobby Dale Dorsey, and told Dorsey about the robbery the night
before. Dorsey left Wine and went to talk with appellant at 1052 Huff. While Dorsey spoke
with appellant, Wine leaned against the black Nissan parked in Miss Hattie's driveway. 

 Suddenly, according to Wine, appellant came out of the house at 1052 Huff and
said, "'[t]hese ol' ass niggers can't take care of their own - - they own business and sent
somebody down here.'" Appellant continued to walk back and forth in the front yard and
the street while yelling about how Wine sent someone down the street to "take care of [his]
business." During this time, Paul Brown drove up and started talking to appellant in the
yard. Appellant then fired a shot in Wine's direction and Wine ran into Miss Hattie's house. 
According to Wine, he returned to the yard and grabbed his gun from McNeal, who had
taken the gun out of the bushes. Wine then went to a tree in the yard where he started
firing back at appellant. Tracy was behind him when he began firing. Allegedly, McNeal
also had a gun, but it jammed when he tried to fire it. Then, according to Wine, appellant
ran into a house, and Wine continued to shoot at the house before leaving. The only
persons Wine allegedly knew to have fired shots were himself and appellant. He did not
know of Paul Brown or Nathan firing any.

 On cross-examination, defense counsel impeached Wine with a prior statement he
had given the police. Therein, he stated that "'he, Kwame and J-Rock ran into Miss
Hattie's house and got some guns" and that "Kwame and J-Rock started shooting back at
Williams, Slim and Brown.'" However, his trial testimony was that appellant shot first and
that he saw Paul Brown with a gun but did not see him shooting. The State rested.

 Appellant called Delores Spurrier to testify on his behalf. Spurrier owned a business
in Pampa, and between April 3rd and April 22nd, she had "a storm-related incident at [her]
business." According to Spurrier, part of her roof had been blown off. The inference was
that the crime scene had not only been unprotected but had also been subject to a violent
storm. The defense then rested and the jury convicted appellant of involuntary
manslaughter. Issues One and Two - Sufficiency of the Evidence
 

 Appellant contends that "[n]o rational jury could have found beyond a reasonable
doubt that a bullet fired from [his] gun caused the death of Tracy Williams." This is so
according to appellant because the forensic examination of the firearms evidence by the
State's expert did not identify appellant as the one who fired the fatal shot. Furthermore,
according to appellant, the prosecution tendered no evidence that the weapons fired by
Wine and others could be excluded as having fired the fatal bullet. And, the "evidence as
to the location where empty cartridge cases or bullet fragments were found is unreliable
because the evidence shows that other persons were firing weapons and that the crime
scene was compromised before and after Officer Morris, the first responder, arrived." 
Appellant further contends that the "crime scene had been unprotected for nineteen days
when a brass bullet jacket was found . . . and later identified as being fired from appellant's
.357 pistol." We disagree.

 Standard of Review


 The standards by which we review claims of legal and factual sufficiency are well
established. We refer the parties to Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61
L.Ed.2d 560 (1979), Zuniga v. State, 144 S.W.3d 477 (Tex. Crim. App. 2004), Zuliani v.
State, 97 S.W.3d 589 (Tex. Crim. App. 2003), and King v. State, 29 S.W.3d 556 (Tex.
Crim. App. 2000) for an explanation of them. Furthermore, manslaughter requires proof
that the defendant acted recklessly, that is, that he consciously disregarded a substantial
risk of which he was aware. See Tex. Pen. Code Ann. §§6.03(c),19.04(a) (Vernon Supp.
2004-05).

 In the case at bar, the evidence shows that 1) the bullet that killed Tracy passed
through the black Nissan where she was standing first, 2) the casing or jacketing of the
bullet separated from the bullet and exited the vehicle leaving two exit holes in the back
passenger side window, 3) a casing fired by a .357 revolver was found in the ground
beside where the car was parked, 4) the direction from which the bullet had been fired was
from the south to the north or from left to right, 5) appellant had been seen in possession
of a .357 revolver during the shooting and was shooting from the street towards the yard
at 1040 Huff, and in the direction of Tracy, 6) appellant's print was found on the .357
revolver found near the scene and which had fired the casing that was found on the
ground, 7) Wine was firing at appellant from in front of the cars and not behind the cars or
towards the cars, 8) when Wine was firing Tracy was behind him, i.e. Wine was firing away
from Tracy, 9) witnesses observed only appellant and Wine with guns, 10) Wine
possessed a Tech 9 when shooting, and 11) after Wine began shooting appellant ran away
from 1040 Huff in a southerly direction which would result in Wine shooting in the opposite
direction of where the vehicles were parked and where Tracy was standing. Thus, we find
the evidence was legally sufficient to show that the projectile that struck Tracy was fired
by appellant.

 In regard to the claim of factual sufficiency, the evidence was not without
contradiction. That evidence consisted of 1) others possessing guns which were
purportedly fired and included a shotgun and another 9 mm gun, 2) the bullet found in
Tracy's body could not be determined as coming from either of the guns used by appellant
and Wine, 3) the crime scene was chaotic with several persons passing through it, 4) the
casing found near the area where the black car was parked was found 19 days later after
the incident, and 5) no one saw appellant shoot Tracy. Yet, we cannot say that these
circumstances and the other evidence of record rendered the verdict clearly erroneous or
manifestly unjust. They created issues of fact for the jury to decide. Therefore, the verdict
does not lack factually sufficient support.

Issue Three - Gang Testimony


 In his third issue, appellant contends that the trial court erred in admitting evidence
of gang-related activity as a motive for the shooting because there was no evidence that
appellant or the victim were gang affiliated or that the shooting was a gang-related crime. 
We find that he waived the issue.

 The same evidence regarding gang affiliation by appellant had been solicited and
admitted without objection elsewhere in the trial. Because it was previously admitted
without objection, any error arising from its re-introduction later in the trial was cured. 
Hudson v. State, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984) (holding that error in the
admission of evidence is cured when the same evidence comes in elsewhere without
objection). 

 Accordingly, we affirm the judgment of the trial court.

 

 Per Curiam


Do not publish.